UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| INDUSTRIAL COMMUNICATIONS AND WIRELESS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF ALTON, NEW HAMPSHIRE, <br><br> Defendant, <br><br> and <br><br> DAVID SLADE AND MARILYN SLADE, <br><br> Intervenor-Defendants. | CIVIL ACTION NO. 1:07-CV-82-JL |

## AMENDED JOINT STATEMENT OF MATERIAL FACTS FOR BENCH TRIAL

Plaintiffs, Industrial Communications and Electronics, Inc. ("IC&E"), RCC Atlantic, Inc. d/b/a Unicel ("Unicel"), and U.S.C.O.C. of New Hampshire RSA #2, Inc. d/b/a U.S. Cellular ("US Cellular") (IC&E, Unicel and US Cellular are hereinafter referred collectively as the "Applicants"), and Intervenor-Defendants David and Marilyn Slade ("the Slades") respectfully submit the following Stipulated Statement of Undisputed Facts to assist the Court in the bench trial scheduled for November 14-15, 2011.

1

## INTRODUCTION

Pursuant to the Court's Procedural Order dated September 29, 2011, the parties have amended and supplemented the prior Statement of Facts submitted to the Court on June 6, 2008 (Doc. No. 39).  The following Statement of Facts includes a brief introductory statement regarding the procedural outline of the case, followed by a table showing the facts offered by the Applicants in support of their claims, those previously offered by the Town to rebut those facts or claims, and additional facts offered by the Slades to rebut the Applicants' facts or claims.  The material is presented in a side-by-side column format, to make it easier to read.  Counsel have endeavored to keep characterizations of the facts to a minimum, to avoid controversy and to simplify the presentation.  Each fact has citations to the Certified Record (hereinafter "(R. ____)").  By submitting this Joint Statement, the parties do not waive their right to proffer additional evidence at trial or to ask the Court to consider additional facts or evidence in the Certified Record. The parties also do not waive objections as to relevance[1] or objections as to the characterization of any of the evidence made herein.

## PROCEDURAL BACKGROUND

This case is an appeal pursuant to § 704 of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7), from the denial of the Applicants' request for a variance needed to construct a 120-foot tall personal wireless services facility at 486 East Side Drive in Alton, NH  (the "East Side Drive Parcel").  On September 16, 2005, the Applicants submitted formal applications for variances to erect two personal wireless services facility towers on two parcels in the Town, on

---

[1] Without limiting the generality of the foregoing, the Applicants do not believe that any information concerning points in time after February 12, 2007, can be considered, on the basis that the question of whether or not the Town has regulated wireless facilities in a manner which amounts to an "effective prohibition" of wireless services must be answered as of the date of the "final action" complained of, which in this case was February 12, 2007.  The Slades disagree.

Wolfeboro Highway and East Side Drive, respectively, requesting both use and height variances, pursuant to the then-existing zoning ordinance. (R. 66-99) The variance for the 1439 Wolfeboro Highway location was eventually approved. (Unless otherwise indicated, the facts recited hereinafter pertain to the proposed East Side Drive facility, which facility is the subject of this litigation.)

Over the course of fifteen months, the Alton Zoning Board of Adjustment ( the "ZBA"), and then the ZBA and the Alton Planning Board jointly conducted hearings, reviewed the Applicants' applications and submissions,  submissions by its own radio frequency engineer, and submissions by abutters and others opposing the application on the East Side Drive Parcel.   In March, 2006, the Town adopted a revised Zoning Ordinance pertaining to wireless towers. Applicants amended their application to the East Side Drive Parcel for consideration under the new Zoning Ordinance.

The ZBA voted to deny the request for a variance to the East Side Drive Parcel on December 11, 2006. (R. 2014)   The ZBA issued a written notice of decision December 15 2006. (R. 2050) The Applicants filed a Motion for Rehearing on January 10, 2007, (R. 2069) which was considered by the ZBA at its meeting on February 12, 2007.  (R. 2139-2147)  The ZBA denied the Motion for Rehearing at that time, *id.* , and issued a written decision dated March 13, 2007. (R. 2212-2226)  This appeal ensued.

## JOINT STATEMENT OF MATERIAL FACTS

|  | Applicants' Facts | Town's Facts | Slades' Facts |
|---|---|---|---|
| **Personal Wireless Services Background** | | | |
| 1. | The TCA defines certain types of wireless telecommunications services as "personal wireless services" (hereinafter "PWS").  The definition of PWS includes (but is not limited to) the type of services commonly referred to as "cell phone" or "mobile phone" services.  (R. 782, 1193) | | |
| 2. | Under federal law, PWS providers must obtain licenses from the Federal Communications Commission (the "FCC") in order to provide such services.   (R. 782) | | |
| 3. | In order to provide PWS, each PWS licensee must deploy a network of antennas sites so that users of mobile devices can send and receive calls and so that they can send and receive data.  Service areas require multiple antenna sites, also referred to as "cell sites."  (R. 782-83, 1193) | | |
| 4. | Each site has a signal coverage area with a limited radius which is affected by trees and other obstructions, and which may be as small as | | |

| | | | |
|---|---|---|---|
| | "only a mile or so" unless "antennas are sufficiently elevated." (R. 784, 1193-9) | | |
| 5. | As demand for PWS has grown, the effect has been to require more cell sites, serving smaller "cells" for each licensed wireless network. (R. 786) | | |
| 6. | Users of wireless devices typically desire and expect to be able to use their devices inside buildings as well as inside vehicles. "In building" coverage requires greater signal strength and this also tends to increase the number of cell sites required in order to adequately serve customers. (R. 786) | | |

**Applicants' Backgrounds and Personal Wireless Service in Alton**

| | | | |
|---|---|---|---|
| 7. | IC&E is engaged in the business of, among other things, constructing the cell sites and other facilities necessary to provide PWS, both for its own benefit and for the benefit of licensed providers of PWS. (R. 22) | | |
| 8. | Unicel and US Cellular are licensed by the federal government to provide PWS in various parts of the United States, including the Town of Alton. As of 2004, both Unicel and US Cellular had insufficient cell sites in the vicinity of Alton, and thus both providers had gaps in their networks in Alton. (R. | | |

| | | | |
|---|---|---|---|
| | 23, 782, 1193-94, 1152) | | |
| 9. | In 2004, Unicel decided that it wished to build additional facilities in Alton so that they could close their coverage gaps and provide adequate PWS to those of their actual and potential customers who live, work, or travel through Alton. Unicel decided to work with IC&E to locate and acquire suitable sites and to obtain the permitting thereof. (R. 699, 1258, 1354) | | Unicel's search area map included a possible site on the west side of Alton Bay in the vicinity of the Alton Bay Christian Conference Center, identified on the Unicel map as "ALTON2." (R. 1153) |
| 10. | In 2005, US Cellular (which initially was not aware of Unicel's plans) contracted with KJK Wireless, for similar purposes. (Decl. of Kenneth J. Kozyra (Doc. No. 36-2), ¶ 2) | | U.S. Cellular, through KJK Wireless, focused its initial search in the Pine Mountain area, west of Alton Bay, and contacted at least five property owners in that area in late 2005 and early 2006. (Decl. of Kenneth J. Kozyra (Doc. No. 36-2), ¶ 5; R. 1738, p. 56, ll. 16-22) |
| 11. | At the time the Applicants began these efforts, Alton had a zoning ordinance which regulated PWS facilities by requiring them to be located in one of four "overlay districts," which included the areas with the greatest elevation within the Town: the top of  Prospect Mountain at elevations over 400 feet above sea level; the top of Mount Bet at elevations over 1300 feet above sea level; the top of Straight Back Mountain at elevations over 1800 feet above sea level; and, an area known as Old Wolfeboro Road, at elevations over 1000 feet | | |

|  | above sea level. In each of these districts other than Mount Bet, tower height was restricted to 120 feet above grade; in the Mount Bet district, towers were permitted at heights up to 80 feet above grade. (R. 168-88, 638-44) |  |  |
|---|---|---|---|
| 12. | The Town had one existing antenna tower in the Prospect Mountain overlay district. Neither Unicel nor US Cellular were located on the existing Prospect Mountain tower, and neither had any other antenna facilities located within Alton.  (R. 168-88) |  |  |
| 13. | Both Unicel and US Cellular determined that, even if they installed antennas on the existing tower on Prospect Mountain, additional facilities would be required in order to close their then-existing coverage gaps in the Town. Unicel decided to locate antennas on the existing tower at Prospect Mountain and also searched for additional locations within the Town's "overlay districts."  (R. 782) |  | U.S. Cellular also has an existing facility on Prospect Mountain.  (R. 1732, p. 32, ll. 13-16; R. 1738, p. 54, ll. 11-14). |
| 14. | IC&E first approached the Town on behalf of itself and Unicel to discuss the possibility of constructing wireless facilities in the Town in 2004.  The Town informed IC&E that it could not file any application at that time because of an "Interim Growth Management |  |  |

| | | | |
|---|---|---|---|
| | Ordinance." IC&E obeyed the Town's instructions and did not file any applications at that time.  (R. 699, 1258) | | |
| 15. | IC&E continued searching for a feasible way for Unicel to provide coverage throughout the Town.  (R. 1258) | | |
| 16. | After determining that additional sites within any of the overlay districts would not be feasible, IC&E and Unicel focused on locations outside of those districts.  (R. 1258-59, 1356-57). | | With respect to the East Side Drive search area, IC&E sent certified letters to ten property owners in August 2004:<br><br>Peter and Tracy Long (Map 11, Lot 25); Joan & Roberts Deroche (Map 12, Lot 39B); Ruthanne Barnet (Map 12, Lot 59); Carol A. Murtagh (Map 15, Lot 5); Katherine Fairman (Map 15, Lot 10); Bayview Forest & Development LLC (Map 14, Lot 22-4); Bradford and Margaret Jones (Map 11, Lots 25, 46 & 47); Roger C. Carter, Jr. (Map 14, Lot 22); Loraine P. Michaud (Map 12, Lot 60); Linda Golter and Mark Odiorne (Map 14, Block 21).  (R. 640-41, 648-59).<br><br>Four of the property owners expressed interest in selling or leasing their land (R. 640-41). |
| 17. | IC&E determined that of the four parcels, only the East Side Drive parcel was feasible from either an engineering or construction point of view (R. 640-41), and IC&E purchased the property on East Side Drive | | |

| | | | |
|---|---|---|---|
| | with a deed recorded on May 19, 2005.  (R. 141-142) | | |
| | **The Initial Applications for the East Side Drive and Wolfeboro Highway Parcels** | | |
| 18. | On September 16, 2005, the Applicants submitted formal applications for variances to erect two personal wireless services facility towers on two parcels in the Town, on Wolfeboro Highway and East Side Drive, respectively, requesting both use and height variances, pursuant to the then-existing zoning ordinance.  (R. 66-99) | | |
| 19. | The Applicants' initial application for variances included information demonstrating that there was a gap in wireless service in portions of the Town.  (R. 37-50)  In addition, the applications included information from Mr. Andrew LeMay, a real estate appraiser, stating that he concluded there would be no diminution in surrounding property values from the granting of the requested variances.  (R. 216-227) | The LeMay appraisal report filed with the initial application was not specific to the Town or to lakefront or resort property.  (R. 216-227) | |
| 20. | | Prior to the first hearing, the Town received five letters opposing the variances for the East Side Parcel, on the grounds that the proposed 120' tower would detract from the beauty of the area, reducing the value of | |

9

| | | |
|---|---|---|
| | properties and harming the Town economy, which relies in great part on tourism.  The letters came from six individuals.  (R. 228, R. 251-252, letters from the Slades; R. 288, letter from abutter Robert Florino; R. 249-250, letters from Misses Bennett; and R. 275, letter from abutter Robin Nahil). | |
| 21. | The applications appeared on the ZBA's agenda for its October 2005 public meeting, but the applications were not heard at that time due to the need to re-notice the hearings.  (R. 233) | |
| 22. | At the hearing on November 3, 2005, the ZBA accepted the applications as complete. No testimony was taken. The ZBA made a finding of regional impact, pursuant to NH RSA 12-K:7 and RSA 36:54-58, and Board requested input from the Lakes Region Planning Commission.  (R. 258) | Due to the nature of the applications, the ZBA was required to determine whether it had potential for regional impacts.  (R. 273)  Pursuant to statute, the ZBA made the finding of regional impact and continued the matters.  (R. 258) | |
| 23. | On November 17, the Board received a letter from the Lakes Region Planning Commission.  (R. 276-277) | The November 2005 letter from the Lakes Region Planning Commission listed, among other things, the importance to Alton and surrounding communities of view sheds for generating revenue from tourism, regional concerns about telecommunications towers visible from other areas, including tower heights above surrounding tree canopies and other visual impacts.  (R. 276- | |

| | | | |
|---|---|---|---|
| | | 277) | |
| 24. | Prior to the next hearing, the Board also received a letter from abutters John Chilton and Jeanne Crouse, opposing the variance application (R. 289) | In the letter opposing the application, Mr. Chilton and Ms. Crouse noted that the Planning Board was in the process of revising the wireless ordinance to improve coverage and reduce visual obtrusiveness and the new ordinance would be voted on at Town Meeting.  (R. 289) | |
| 25. | At the December 1, 2005 hearing, the Board requested additional service coverage information from the Applicants, and continued the matter to January 5, 2006, its next meeting.  The ZBA noted eight residents opposed the proposal: the Slades, John Chilton and Jeanne Crouse, Robert Florino, David and Priscilla Lawrence, and Robin Nahill.  (R. 297)  The ZBA noted that no "balloon test" pictures were included from Lake Winnipesauke or from surrounding communities.  (R. 294)  The ZBA discussed the need to obtain review of the application and potential alternative locations from the Town's engineers, and from an independent radio frequency ("RF") engineer expert.   (R. 298) | Applicants presented their applications and discussed them with the Board.  (R. 292-298)  Two members of the public spoke in opposition, David and Marilyn Slade.  (R. 297)  The Town Planner, Ms. Menici, requested the appraisal reports that would deal with changes in valuation of residential properties in rural resort communities when a PWSF is installed and N.H. case law on the requirements of the TCA.  (R. 296-298) | |
| 26. | Additional materials were submitted by the Applicants in support of their application, dated December 2, 2005, included a power point presentation showing balloon tests and a simulated | | |

| | | | |
|---|---|---|---|
| | tower, indicating the visibility of the proposed tower on the East Side Drive Parcel from various locations.  (R. 323-326) | | |
| 27. | The application indicated that the proposed monopole could structurally accommodate at least five (5) wireless service providers at 10' intervals on the tower with the lowest at 80', but at the time of the application, Unicel was the only carrier included.  (R. 39) | | IC&E and RCC/Unicel's original application indicated that there would be two (2) dish antennas mounted at a height of 75 feet and room for additional antennas at 80, 90, 100 and 110 feet, with RCC's antennas mounted at 120 feet.  (R. 38-39) |
| 28. | | Prior to the January 5, 2006 meeting of the ZBA, an appraiser hired by the Slades, William McLean, provided a letter stating erection of the towers would diminish property values. (R. 588-590) | |
| 29. | | On December 13, 2005, the Town Planning Board conducted a public work session on the draft of the proposed new wireless telecommunications facility ordinance. (R. 661) | |
| 30. | Neither the Applicants nor any other wireless industry representatives received notice of this session and no input was obtained from either the Applicants or other industry representatives until January 19, 2006.  (R. 699-708) | Jeanne Crouse, an abutter, stated in a letter to the ZBA opposing the applications, that a subcommittee of the Planning Board was re-writing the Telecommunications Ordinance to address problems with wireless coverage and that the proposed new ordinance would be voted on at Town Meeting.  (R. 289)  Applicants requested a copy of this and the other abutter letters | |

| | | | |
|---|---|---|---|
| | | submitted prior to the December 1 ZBA hearing. (R. 345) | |
| 31. | The Applicants also were not informed that the Planning Board would be holding a public hearing on January 3, 2006, to discuss the pending revisions to the Ordinance. | The Planning Board held a public hearing on the draft new wireless telecommunications ordinance on January 3, 2006 pursuant to the legislative process for such amendments. (R. 598, 607-608)  The public hearing was conducted pursuant to posted notice and publication in the local newspaper pursuant to RSA 675:7.  (Town's Response to Applicants' Interrogatories, attached thereto as Exhibit A, pp. 6, 13-15, 17, 26-27). | |
| 32. | At the January 5, 2006 ZBA hearing, the Applicants submitted the additional materials in support of their applications requested by the Board at the last meeting.  (R. 586-620) | The additional materials each delivered at the hearing were not considered at that time, pursuant to the Board's procedures on materials provided at hearings. (R. 586 and 620), but instead the hearing was continued until February 2, 2006.  (R. 621) | |
| 33. | | At the January 5, 2006 hearing, the ZBA discussed the cost for the RF engineer suggested by Town counsel and staff, Mark Hutchins, who proposed to provide an analysis for approximately $4,900.  (R. 619-21) | |
| 34. | | Don Cody, representing the Applicants, objected to the cost and noted that Mr. Hutchins' rates were 40-50% higher than others.  (R. 620) | |

| | | |
|---|---|---|
| 35. | The ZBA voted to obtain two more quotes from RF engineers and to hold a special meeting January 23, 2006 to review them and pick an RF engineer.  (R. 620) | |
| 36. | On January 10, 2006, the Town faxed the proposed new "Personal Wireless Service Facilities Ordinance" to Eric Stern, an attorney representing the Applicants. (R. 670-672) | On January 17, 2006, Attorney Earl Duval sent a letter to Don Cody and Kevin Delaney at IC&E discussing the proposed new ordinance. Among other things, he advised his clients that "all that would be needed to defeat the application would be one available property that could host a tower 10 feet above the tree line." (Doc. No. 47, Ex. D).  Duval warned Cody and Delaney that, in view of the new ordinance's preference for a lower height tower, "your profit margins would suffer as a result." Id. |
| 37. | This was the first notice to the Applicants of the proposed change (R.    699-708). | |
| 38. | On January 17, 2006, pursuant to public notice per RSA 675:7, the Planning Board held a second public hearing on the draft new wireless ordinance.  (Town's Response to Applicants' Interrogatories attached hereto as Exhibit A at pp. 6, 29-33) | |
| 39. | On January 19, 2006, after reviewing the proposed new wireless ordinance, the Applicants advised the Alton Planning Board by letter that | Applicants did not participate in the public hearing or submit any written materials on the proposed ordinance until January 19, 2006, after |

| | | |
|---|---|---|
| | the proposed new ordinance presented "issues," including but not limited to potential violations of new Hampshire law. (R. 699-708) The Planning Board did not respond to the Applicants' letter, and the proposed Ordinance was placed on the warrant for the March 2006 Town Meeting, without further changes. | the final public hearing before Town Meeting. (R. 699-708) | |
| 40. | | The final form of the proposed ordinance was voted on by the Planning Board at the Public Hearing January 17, 2006, pursuant to RSA 675:3,III. | |
| 41. | | Applicants offered the names of three RF engineers or consultants which they had "found reputable in the past," for the Town to hire, including Mark Hutchins and David Maxson in a letter to the Town on January 16, 2006. (R. 673) | |
| 42. | At the special meeting on January 23, 2006, the ZBA voted to hire Mark Hutchins as an independent RF engineering expert. (R. 860-861) | At the January 23, 2006 meeting, the ZBA members discussed the RF engineers recommended by the Applicants and voted to hire Mr. Hutchins, who provided the lower bid. (R. 675-693) | |
| 43. | At the February 2, 2006 hearing, the applications were not considered but were continued until March 13, 2006 so that Mr. Hutchins would have time to complete his work. (R. 718) | At the same meeting on January 23, 2006, at the suggestion of Ms. Menici, the Board voted to continue the hearing on the Applicants' projects at the next regular meeting of the ZBA, February 2, 2006, since the RF report would not be prepared yet, to save the Applicants the time | |

| | | | |
|---|---|---|---|
| | | and expense of attending that hearing on February 2, 2006. (R. 693, 694-718) | |
| 44. | | The ZBA continued to receive letters from residents opposing the variance applications.  (R. 750, 775, 778, 779, 830) as well as a petition signed by 152 Alton residents against the applications.  (R. 806-813) | |
| 45. | At the March 13, 2006 hearing, the applications were not considered but instead were continued until April 6, 2006. (R.756) | Prior to the March 13, 2006 hearing, counsel for Applicants requested that consideration of the applications be continued, since Mr. Hutchins' report was not ready yet.  The ZBA agreed with that request and continued the hearing on the applications to April 6, 2006. (R. 751-2, 756-7, 759-766) | |

**The New Ordinance and the Amended Application**

| | | | |
|---|---|---|---|
| 46. | At Town Meeting on March 14, 2006, Alton voters approved the new Personal Wireless Service Facilities Ordinance. (R. 1523)  The new Ordinance eliminated the four "overlay districts" and instead provided that wireless facilities are allowed anywhere in the Town. However, the new Ordinance also contains various restrictive criteria, including a limit on the height of any new wireless facility to ten feet above the "average tree canopy" surrounding the proposed facility. | | The Town of Alton voters approved the new ordinance by a 75% majority. (R. 1697) The Ordinance permits the construction of personal wireless service facilities only where "the facility will not visually dominate any viewshed in the Town." Town of Alton Zoning Ordinance §603.4.1. |

| | | |
|---|---|---|
| 47. | The following day, March 15, 2006, the Applicants attempted to determine what would be required to proceed in light of the Ordinance amendment and raised concerns about delays. (R.776-77). | Ms. Menici prepared a timeline for the Board to assist it in responding to the concerns about delay showing lack of information, payment or agreement by Plaintiffs as cause for several delays and continuances. (R. 860-861) | |
| 48. | At the April 6, 2006, hearing, the applications were not considered but instead were continued until April 25, 2006 (R. 819) | Prior to the continuation date for the Applicants' proposals, their counsel, Eric Stern, requested a continuance to April 25, 26 or 27, 2006 in a letter dated April 5, 2006. (R. 819) The ZBA acceded to that request and continued the hearing to April 25, 2006, Applicants' "first choice." (R. 814, 819) | |
| 49. | On April 24, 2006, the Town Planner informed the ZBA that based on her discussions with Town Counsel "the applicant must withdraw all applications currently pending...and submit a new application...[and] notice all abutters, including regional notification." (R. 862) | In a memo to the ZBA dated April 24, 2006, Ms. Menici disputed Applicants' characterization of her statements to them (opposite), stating that she had not told Applicants what the ZBA would do but had referred the question of the correct procedure with the new ordinance in effect to Town counsel who had stated that the Applicants could proceed either under the new or the old ordinance. (R. 862) | |
| 50. | At the April 25, 2006 hearing on Applicants' variances, the ZBA discussed the new ordinance. The Board voted to allow Applicants to amend their application and to send a new notification by regular mail to abutters due to the new ordinance and the requirements thereunder. (R. | | |

| | 871) | | |
|---|---|---|---|
| | **The Hutchins Reports and Testimony** | | |
| 51. | Mr. Hutchins, the Town's RF engineer, had prepared his first report on the applications for variances entitled "Wireless Facility Analysis" dated March 27, 2006, based on the original ordinance.  (R. 780-800)  Mr. Hutchins' concluded that "Unicel has shown inadequate coverage within the Town" and that adequate coverage "cannot be accomplished by antenna placement within existing overlay districts at the maximum heights allowed in each."  He also concluded that "[r]oaming … is not a viable coverage alternative" and that "[t]he applied for antenna heights are reasonable to provide adequate coverage, particularly if collocation is considered."  (R. 790-791)  After reviewing this conclusion at the April 25, 2006 hearing, the Board voted to require an addendum to the original report by Mr. Hutchins due to the change in the Ordinance.  (R. 872-873)  The hearing was then continued until May 23, 2006. ( R. 874) | | |
| 52. | Prior to that hearing, the Applicants amended and re-noticed their application and provided additional | After the April 25, 2006, hearing, the Board received additional letters against the application from Mr. and Mrs. | |

| | | |
|---|---|---|
| | information in support thereof. (R. 887-1000) | Sackos, regarding the negative effect on property values and the incompatibility of a cell tower on East Side Drive (R. 866); and from Mr. Russ Wilson, opposing the variance applications on the grounds of aesthetics and health concerns, as well as proposing alternatives in the form of lower towers. (R. 1053) | |
| 53. | | | In a letter dated May 3, 2006, Hutchins, through Town Engineer Eric Reitter, requested that the Applicants explore Evans Hill as a possible alternative to the applied-for sites.  (R. 891)<br><br>Evans Hill is located to the north and east of the proposed location at 486 East Side Drive, and is set further back from the Lake itself than the proposed East Side Drive site. |
| 54. | The Applicants were informed on May 9 that an additional $4,900 would have to be paid and that Mr. Hutchins' "engineering review would be suspended until the Town receives payment." (R. 905) The Applicants paid this amount under protest. *Id.* | | |
| 55. | | | In response to the Town's request, RCC/Unicel submitted a radio frequency analysis for Evans Hill dated May 12, 2006, which evaluated possible coverage from Evans Hill in conjunction with the existing |

| | | |
|---|---|---|
| | | Prospect Mountain facility, but without taking into account the potential coverage to be provided from the proposed tower at Robert's Knoll Campground, or any other combination of potential locations. (R. 2055) |
| 56. | Also prior to the May 23, 2006 hearing, Town officials suggested that the Applicants agree to a joint meeting of the Planning Board and the ZBA, so that the Planning Board could address site plan requirements which are within its exclusive jurisdiction, and the Applicants agreed in the hopes of expediting the process (R. 1031) | On May 22, 2006, Applicants filed applications for site plan review with the Planning Board, to allow a joint hearing with the ZBA and the Planning Board, to expedite the process.  (R. 1031) | The Site Plan submitted to the Planning Board, dated June 19, 2006, depicts a 120-foot monopole with RCC antennas at 120 feet, U.S. Cellular antennas at 110 feet, RCC dish antennas around 90 feet, and equipment shelters for up to six carriers (R. 1113-14). |
| 57. | At the May 23, 2006 hearing of the ZBA, there was some brief procedural discussion but no consideration of testimony or other evidence, and the matter was adjourned once again, this time until the June 20, 2006 meeting. (R. 1048-50) The June meeting did not take place, however, because of a lack of a quorum (R. 1178) and no further hearings were scheduled in either July or August. | At the May 23, 2006 hearing of the ZBA, the Board discussed the benefits of a joint hearing with the Planning Board for the public and the Applicants, and the need for extensive notification.  The Board voted to do a joint hearing.  Due to the lengthy notification process, no date certain was set but it was left to Ms. Menici to schedule the hearing.  (R. 1048-50) | |
| 58. | | | On May 26, 2006, the Applicants submitted a support statement in which they indicated that two dish antennas would be mounted at 75 feet and the facility could accommodate up to 5 wireless carriers.  (R. 1058).

With respect to Evans Hill, |

| | | |
|---|---|---|
| | | the Applicants stated that they evaluated the site and "determined that it was not feasible because it would leave a significant gap in wireless coverage" and because the Applicants "do not own or have a leasehold interest for any property located on Evans Hill." The Applicants also stated that "[e]ven if a site on Evans Hill would be a feasible alternative, there is no evidence that it would be a superior alternative to the Applicants' proposed sites." (R. 1063) |
| 59. | A joint hearing was scheduled for June 20, 2006, but not held due to the absence of a quorum.  (R. 1174-1178) | |
| 60. | Because the new Personal Wireless Service Facilities Ordinance imposes a height limitation on wireless facilities of ten feet above the "average tree canopy,"   a report from a forester, Mr. Peter Farrell, dated June 15, 2006, was submitted.  (R. 1095-1104)   In his report, Mr. Farrell concluded that the average tree canopy above baseline was 61' at the East Side Drive Parcel, and that this could be expected to rise by .5 to 1 foot per year.  (R. 1095). | | |
| 61. | While IC&E and Unicel were going forward as described above, US Cellular decided to put its own effort to find suitable sites on hold and to join in the pending | Material provided by the Applicants continued to show open spaces on the tower for future wireless service providers.  The Applicants had contracts secured for only | U.S. Cellular joined in the pending applications of IC&E and Unicel even though the "East Side Drive parcel is farther to the east than the area that U.S. |

| | | |
|---|---|---|
| | applications of IC&E and Unicel. On June 2, 2006, the Applicants informed the Town that US Cellular was joining in the application. Materials in support of US Cellular's co-application were forwarded to the Town on June 16, 2006. (R. 1078, 1099-1149) | two: U.S. Cellular and Unicel. (R. 1114) | Cellular's engineers had identified as ideal for their coverage needs." (Decl. of Kenneth J. Kozyra (Doc. No. 36-2), ¶ 6). U.S. Cellular did not do any further independent investigation of potential sites after joining the pending applications. See Decl. of Kenneth J. Kozyra (Doc. No. 36-2). |
| 62. | Mr. Hutchins provided an addendum to his Wireless Facility Analysis ("Second Hutchins Report") dated June 19, 2006. (R. 1150-73) He cited two scientific studies confirming that "as a rule of thumb," wireless antennas need to be located fifteen feet above the tops of trees and that "the cell site should be placed away from trees" (R. 1155) but nevertheless concluded that the "requested antenna heights may be lowered twenty to twenty-five feet" because "it appears that nearby tree canopy is not as high as applicant calculation." (R. 1152) He also explained that there might be an additional alternative, known as Evans Hill, which "showed promise" and should be further explored. (R. 1152) | In the second Hutchins Report, Mr. Hutchins noted that he believed a 75' centerline height is "reasonable" for the U.S. Cellular antenna. (R. 1155) | With respect to Evans Hill, Hutchins found that the higher ground elevation and location gives it "a better RF 'view' of the Lake and shore areas to its north, although it moves coverage away from Alton Bay in general and portions of Route 28A in particular.... [S]ome loss of Evans Hill PCS coverage south and west could be satisfied by use of the National Grid Communications tower off Old Wolfeboro Road or 'Alton2' [near the Alton Bay Christian Conference Center] ... " (R. 1160) Hutchins noted that "Evans Hill may actually be preferable to [East Side Drive] for cellular" but did not eliminate the need for a facility at Robert's Knoll Campground. (R. 1152, 1160) |
| 63. | Mr. Hutchins also confirmed that when multiple carriers use the same tower, they are spaced ten vertical feet apart, and discussed the possibility that since at least two carriers were interested in the site, | | |

| | | | |
|---|---|---|---|
| | instead of putting one carrier's antennas above the other's on the same tower, two towers -- referred to as horizontal co-location -- might be used. (R. 1156) He concluded that such a deployment could be used only "with great caution" and that if this approach were taken "there may need to be [*sic*] considerable separation [*i.e.,* physical distance]" between the two towers. (R. 1156) | | |
| 64. | Mr. Hutchins also reiterated that even if they were to use space on currently existing towers serving the Town, both Unicel and US Cellular had shown inadequate coverage for their wireless services. (R. 1160) | | |
| 65. | Mr. Hutchins concluded that a tower height of at least 95 feet would be needed for two carriers, and suggested that it would not be "unreasonable to consider another 10 or 20 feet" (that is, up to 105 or 115 feet) to provide space for additional carriers "since collocation on one structure may avoid additional towers in this portion of the Town." (R.1161) His additional materials provided examples of camouflaged towers such as stealth pine trees. (R. 1172) | | |
| 66. | Following the second Hutchins report, the Applicants presented more information to him and asked him to engage in further analysis. In particular, the | | The Applicants inquired into the availability of a single property on Evans Hill (Tax Map, 15, Lot 26), by sending letters in June and July to the property owner, Christian |

| | | |
|---|---|---|
| Applicants disputed the conclusions regarding tree canopy and pointed out that it is not enough to be above "average" tree height, but rather that the antennas must be fifteen feet or more above the tallest trees. (R. 1184-4) They thus continued to insist on the need for the 120' height requested. (R. 1192-1195) The Applicants also established that they had not been able to contact the owner of the Evans Hill property despite reasonable efforts. (R. 1184-1191) and that, in any event, a tower on the top of Evans Hill would not allow closure of the coverage gaps (R.1195) This process continued until September 2006. | | Camps and Conference ("CCC") (the owner of the Brookwoods Camp for Boys in Alton), via certified and regular mail to an office in Boston. (R. 1183-1190) Neither of these letters was opened.<br><br>The Applicants never attempted to contact the owners of Tax Map 15, Lot 25 on Evans Hill, which abuts the CCC site. |
| 67. | | | In a letter dated August 1, 2006, Reitter noted that the Applicants had not submitted information showing that they had met their obligation under the Ordinance to prove that no existing structures are suitable for a personal wireless service facility to address the alleged coverage gap. (R. 1204-05) |
| 68. | A joint meeting of Planning Board and ZBA was finally scheduled for September 12, 2006. At the meeting, the hearing proceeded, and there was testimony for and against the variance applications. The Town's Fire Chief, Alan Johnson testified that he "wholeheartedly" supported the proposed facility because | On September 1, 2006, the ZBA received a letter from Hawkeye Appraisals, another appraiser hired by the Slades, stating that there is generally a diminution in property values from the location of cell towers in areas where views are highly valued and properties are subject to the view tax.   (R. 1231-1233) | At the September 12, 2006 meeting, Don Cody, Director of Operations for IC&E, testified that "height … is an issue that we will address very aggressively because it goes to the core of co-location; minimizing the amount of towers that are needed in the area." (R. 1257 (p. 13, ll. 19-21); "We look at |

| | | |
|---|---|---|
| | it will "enhance our coverage within the town as far as public safety services go." (R. 2240-41) The Applicants pointed to evidence disputing the position taken by Reitter, in that neither existing towers nor existing buildings would allow closure of the coverage gaps. (R. 1193-94;1211-25;1382-89) | | how can we service this town in its entirety.  It's selfish on our part certainly because we want to be the provider of that service… at least as far as the locations go."  (R. 1258, p. 14, ll. 1-4)  He also testified that IC&E "prefer[s] to own the property… because then we can control what is around the property. We can control the buffer zone, we can control the tree cutting and we can be reasonably assured that what you see today will be in place for the future." (R. 1260, p. 23, ll. 7-12).  With respect to the proposed height of 120 feet, Cody testified that the tower could accommodate "five of the six present major carriers." (R. 1281, p. 106, ll. 11-13)  Regarding the topping of trees, Mr. Cody testified, "We can to a limited point but only to our property line.  I point out that our issue is not the growth of the trees…" (R. 1280, p. 103, ll. 2-4) |
| 69. | Mr. Hutchins testified that the antenna panels typically used by the carriers are typically 4 to 6 feet high, "[b]ut I do see some 8 footers" and that the two carriers "can tell you more...what they're doing with their antennas."  (R. 1266)  He explained that he had again reviewed the tree data as requested by the Applicants, that he agreed that the antennas would need to be well above the tallest trees in the vicinity, some of | | Regarding Evans Hill, Hutchins testified that the Applicant-carriers would "probably need something to still fill in between basically downtown here and up to where they'd lose the coverage from Evans Hill or where it wouldn't be so good."  (R. 2260)  He concluded that "there isn't anything that's jumped out at me that would work as an alternate site and that we really need two separate |

| | | |
|---|---|---|
| which were more than 85 feet tall (R. 2249) and that, particularly when the need for a microwave antenna and at least two carriers was considered, he was of the opinion that his original conclusion, recommending approval of a 120 foot tower, was correct. (R. 2250-52) He also confirmed that neither Evans Hill nor any other locations presented a viable alternative. (R. 2260-61) This corroborated the submissions of the Applicants, who had submitted extensive documentary evidence and testimony throughout the hearing process concerning their unsuccessful efforts to find alternative locations. (R. 1354-57, 1569) | | facilities to fill between the Wolfeboro boundary and the coverage that we can get using the available space that's on the Prospect Mountain.  There will probably also need to be a facility in the original map from Unicel where they were drawing the circles … on where they might have other cells. . . . One of them was over on the other side of the bay…" (R. 2260-62)<br><br>He also noted that "northwest of the bay is not going to be completely covered by the East Side Drive facility …" (R. 2262). |
| 70. | | The Slades spoke against the variance for the East Side Drive Parcel, as did Mr. Wilson and Ms. Stacey.  (Mr. Slade: R. 1267-1270; Mr. Wilson: R. 1270-1271; Ms. Stacey, R. 1271-1274; Mrs. Slade, R. 1271; and Mr. Wilson, R. 1274-1275). | |

**Zoning Board Proceedings and Denial of the Variance Application**

| | | |
|---|---|---|
| 71. | Following this hearing, US Cellular submitted an engineering report stating that "horizontal collocation" on the same tower was not an option because, in the absence of very substantial distance between the two towers, the antennas would still need to be spaced vertically by the standard ten | Mr. Hutchins discussed horizontal collocation in the context of two or more separate, lower towers (R. 1156) not "collocation on the same horizontal mount of a tower structure," as U.S. Cellular's report describes. (R. 1337) | |

| | | | |
|---|---|---|---|
| | (10) feet. (R. 1336-37). | | |
| 72. | Also following the September 12 hearing, the Planning Board attended balloon tests showing the location of the proposed towers at various heights. (R. 1338-1346) | The balloons at all heights were visible in most places and were most prominent from the Lake. (R. 1496) | With respect to the balloon tests, Tom Hoopes, former chairman of the Planning Board, testified that "[t]hose who saw the balloon test [from the East Side Drive location] know how visible the first balloon was, which was only 15 feet above the canopy.... [I]f you saw the test, you know that the lowest balloon, which was at 75 feet ... was plainly visible from many locations. There was no difficulty in seeing the top balloon, which was at [120] feet, from the vast majority of the entire bay area." (R. 2003, p. 52, ll. 7-9; p. 53, ll. 2-8) Timothy Kinnon, acting Chairman of the ZBA, testified that he "stood on the Mt. Washington dock, where a great number of people come to view this lake, to view the surrounding mountains, and I could clearly see all three balloons. And then all along the bay, they were very visible.... [R]elatively speaking, and in perspective, I think at this location, it's simply too tall." (R. 2012, p. 87, ll. 6-13). |
| 73. | At the next joint hearing of the ZBA and the Planning Board, held on October 10, 2006, the Applicants again provided testimony and written materials in support of their application, and several residents again spoke in opposition to the variance. | In response to the Applicants' request for further analysis, the Town's forester provided additional information on his methodology. (R. 1474-1475) | At the October 10, 2006 hearing, Mr. Cody insisted that "we do need some space on there to accommodate the carriers, and I think that has finally been worked over enough that we all understand that that's the only thing we can do." (R. |

| | | |
|---|---|---|
| (R. 1513-22) | | 1498, p. 15, ll. 19-22). With respect to the issue of the Applicants' investigation of alternative sites, Mr. Cody said, "I think we've done our due diligence ... and I think that it is sufficient at this point." (R. 1507, p. 51, ll.8-10); "We are not under some restraint to find an alternative site." (R 1507, p. 53, ll.11-12). |
| 74. | | On November 2, 2006, the Alton Planning Board voted to request, at the Town's expense, that the Applicants explore a multi-site solution to address the alleged coverage gap. (R. 1526, 1528, 1535, 1658) |
| 75. | | By letter dated November 14, 2006, the Applicants objected to the Planning Board's request for a further study, claiming that they had already performed an investigation of alternative sites.  (R. 1658-59) |
| 76. | The Planning Board voted to make certain "findings" but ruled that these were not a "denial" (R. 1489-91 ). As a result of this procedural development, the Applicants decided to withdraw their request for site plan review and proceed only with the request for a variance.  (R. 1656-63) | The Planning Board voted unanimously to find that (1) a 120' tower on the East Side Drive Parcel would dominate the view shed of Alton Bay in violation of Town Zoning Ordinances; (2) that the PWSF Ordinance is in conformance with the Town's Master Plan; (3) that the Applicants did not investigate a multiple unit network of wireless facilities as required; (4) that Applicants' had not made sufficient inquiry to other possible site owners; |

| | | | |
|---|---|---|---|
| | | and (5) that the Planning Board refer the case to the ZBA for further consideration.  (R. 1535) | |
| 77. | | The Slades submitted another letter in opposition to the application dated November 28, 2006 (R. 1664-1685) including information with regard to the recent permitting of a wireless telecommunications facility in the Town of Wolfeboro for Plaintiff Unicel, which they claimed was at a height of 10' above average tree canopy (R. 1676-1684)  Mr. Slade also included an additional letter dated November 27, 2006 from Appraiser McLean in which Mr. McLean concluded that the 120' tower proposed for the East Side Drive property would "directly and adversely affect the view amenity from the residents, resulting in an adverse affect on value."  (R. 1686-1687) | |
| 78. | At the meeting of the ZBA on November 30, 2006, the ZBA again considered the East Side Drive variance application. The applicants again made an extensive presentation.  Among other things, the Board and the Applicants' representatives discussed the options for horizontal co-location.  (R. 1739) The ZBA then voted to continue the hearing.  (R. 1758) | First on the agenda for the November 30, 2006 ZBA meeting was Applicants' other variance request, for the Wolfeboro Highway parcel. After discussion, the ZBA unanimously approved a variance for a 120' wireless tower on that site.  (R. 1734) After a brief recess, the ZBA heard lengthy additional testimony from Applicants and opponents regarding the East Side Drive parcel application.  After an extensive hearing, the Board voted to recess and continue | |

| | | | |
|---|---|---|---|
| | | the hearing at the earliest possible time. (R. 1758) | |
| 79. | | At the November 30, 2006, hearing, Board members discussed the fact that the 120' foot tower proposed for East Side Drive still showed space for five (5) antenna arrays. Board member Mr. McKinnon inquired whether reducing the tower by 30', limiting it to three (3) carriers only, would be possible. (R. 1742) Mr. Kozyra, on behalf of Applicants explained, it was not. (R. 1742) | Mr. Cody testified that IC&E tries to "put together a structure that is going to accommodate structurally, at least … any needs that may come forward." (R. 1741, p. 69, ll. 3-7). He further testified that he believed the proposed tower "is capable of handling six major carriers, and typically, it's overbuilt enough so if public safety needed to use it, minor carriers, they would still go on that tower." (R. 1742, p. 70, ll. 7-10). |
| 80. | | The Board members discussed whether, with the 28 acres at the East Side Drive location, there was sufficient space for horizontal co-location, i.e., multiple lower tower facilities. (R. 1743) On behalf of Applicants, Mr. Cody stated there was not. (R. 1743) | |
| 81. | | In opposition, Mr. Alden Normand spoke against the variance, indicating that the encroachment of the towers on the lake shore area would impinge on "Alton's treasure." (R. 1744) | |
| 82. | | Mr. Slade also spoke in opposition, reiterating those same concerns with regard to aesthetics, diminution in value of properties, lack of consistency with the ordinance, failure to meet the substantial justice standard, or | |

| | | | |
|---|---|---|---|
| | | meet the spirit of the ordinance.  (R. 1735-1753)  Mr. Slade pointed out that the Town has been cooperating with Applicants, particularly in passing a less restrictive ordinance after Applicants had filed their application for a variance under the earlier ordinance.  (R. 1753.) | |
| 83. | | Applicants presented additional information.  (R. 1753-1756)  Mr. Jerry Albright, a certified appraiser, testified that the material presented most recently by Applicants' appraisal experts did not provide comparable information. (R. 1746-1747; 1756) | |
| 84. | | After the November 2006 meeting, the Slades provided another letter, with an additional letter from Appraiser William McLean, dated December 8, 2006.  (R. 1945-1959)  This McLean letter noted that the Slade property has a substantial rate of tax for its view amenity.  It also noted that none of the data presented in any of the appraisal documents delivered on November 28, 2006 by the Applicants indicate that any of the residential properties have any view amenity, which was of sufficient quality as to be taxed by the municipalities in which they were located.  (R. 1959) | |
| 85. | At the continued hearing on December 11, 2006, the ZBA heard more testimony from | At the December 11, 2006 hearing, Ms. Karen Stacey spoke against the application, | |

| | | |
|---|---|---|
| | both the Applicants and the public about the variance application for the East Side Drive Parcel.  (R. 1960-2012) | on how the application fails to meet all the criteria necessary under New Hampshire law to grant the variance.  (R. 1991-1994)  Mr. Russell Wilson spoke about the failure of the application to meet the spirit of the ordinance, which is designed to minimize visual impact with smaller, lower towers, and on the diminution of property values due to the impact on the views by such a tall tower.  (R. 1994-1996; 1997-1998)  Mr. Chuck Westin spoke against the application, stating that the request for a 120' tower was not within the spirit of the ordinance, although a request for a variance for an additional ten or twenty feet would have been. (R. 1998-2000)  Ms. Bette Sackos spoke against the application, on the grounds that it would have a negative effect on aesthetics and valuable views in the community, and would cause a diminution in property values.  (R. 2001-2002) | |
| 86. | | Former Planning Board Chair and current Planning Board member Mr. Hoopes testified about the process for adopting a new telecommunications facilities ordinance to provide background on the spirit of the ordinance.  He said that the twin goals of the new ordinance were minimizing visual impact while improving personal wireless service in the community.  He | |

| | | | |
|---|---|---|---|
| | | commented that there has been no flexibility shown by the Applicants in their application regarding the height of the tower requested. (R. 2002-2005) | |
| 87. | | Ms. Jeanne Crouse, Planning Board member, and Chair of the Planning Board subcommittee that had drafted the revised ordinance, also described the process for developing that ordinance and the goals of proving coverage while minimizing visual impact.  She addressed the requirement for granting a variance that the request be in harmony with the spirit of the ordinance, commenting that the 120' height of the tower proposed was not consistent with the spirit of the ordinance.  (R. 2005-2006) | |
| 88. | | Mr. Ruben Wentworth testified against the application, noting that the Town had a preference in its zoning ordinance for smaller towers to provide better service rather than tall ones, and commented that the Applicants needed to cooperate and compromise with the Town.  (R. 2006-2007) | |
| 89. | | Mr. Slade spoke again, noting all the criteria for granting a variance under New Hampshire law, the failure of Applicants to meet any of them.  (R. 2007-2009) | |

| | | |
|---|---|---|
| 90. | | The ZBA, throughout the public comments, permitted Applicants' multiple representatives the opportunity to rebut the specific comments made by those opposing the application.  After hearing from the public and the Applicants, the ZBA reviewed the legal requirements for obtaining a variance under New Hampshire law, and discussed each one.  (R. 2013-2014) | |
| 91. | At the conclusion of the December 11,  2006, hearing, the ZBA voted to deny the applications for a variance for a 120' tower on the East Side Drive parcel and issued a written "Notice of Decision," dated December 15, 2006. (R. 2014 and 2050-2051) | | |
| 92. | As required by N.H. RSA §§ 677:2, 677:3 and 677:4, the Applicants timely sought a rehearing by Motion filed on January 10, 2007.  (R. 2069-2079)  On February 1, 2007, the Motion appeared on the ZBA's agenda, but the ZBA accepted the motion for re-hearing and continued it until its February 12, 2007 meeting date to give ZBA members the opportunity to review the minutes of the December 11, 2006 ZBA hearing.  (R. 2109) | | |
| 93. | At the February 12, 2007 ZBA meeting, the Board reviewed the evidence and voted unanimously to deny the Motion.  On March 13, | | |

| | | |
|---|---|---|
| | 2007, the ZBA issued a Notice of Decision.  (R. 2212-2226) | |
| 94. | | On July 30, 2007, Verizon Wireless announced that it was acquiring RCC/Unicel. The acquisition closed in August 2008.[2] |
| 95. | | In March 2011, Town voters approved an amendment to the Ordinance raising the height limit for new ground-mounted personal wireless facilities service to twenty (20) feet above the average tree canopy. |

---

[2] The Applicants object to any consideration of facts from this point in time onward, on the grounds that the relevant inquiry is whether or not the denial amounted to an effective prohibition at the time it was made, and in any event neither the fact that Verizon acquired the Unicel license nor the fact that an 81-foot tall tower *might* now be approved by the  Planning Board without a variance is material. The Slades disagree.

Respectfully submitted,

**INDUSTRIAL COMMUNICATIONS AND
ELECTRONICS, INC., RCC ATLANTIC,
INC. d/b/a UNICEL and U.S.C.O.C. OF NEW
HAMPSHIRE RSA #2, INC. d/b/a U.S.
CELLULAR,**

By their attorneys,

**DEVINE, MILLIMET & BRANCH,
PROFESSIONAL ASSOCIATION**

Dated: November 4, 2011

By:   /s/ Steven E. Grill_____
      Steven E. Grill (Bar. No. 7896)
      111 Amherst Street
      Manchester, New Hampshire 03101
      Telephone:  603.669.1000
      Facsimile:  603.669.8547
      sgrill@devinemillimet.com

      AND

      **DAVID AND MARILYN SLADE**

      By their attorneys,

      **<u>SHEEHAN PHINNEY BASS + GREEN PA</u>**

      <u>/s/ Christopher Cole</u>
      Christopher Cole, Bar No. 8725
      Karyl Roberts Martin, Bar No. 16468
      1000 Elm Street, P.O. Box 3701
      Manchester, NH  03105-3701
      (603) 627-8223
      ccole@sheehan.com

**<u>Certification of Service</u>**

      I, Christopher Cole, do hereby certify that on this 4th day of November 2011, I served the foregoing, by the ECF Filing System, upon all counsel of record in this matter.

                       /s/ Christopher Cole
                       Christopher Cole